UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

PATRICK DECARO,

    Plaintiff,

v.                                                 CASE NO. 3:15-cv-1462-J-MCR

ACTING COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

    Defendant.
_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying his application for a period of disability and disability insurance benefits ("DIB"). Plaintiff alleges he became disabled on July 3, 2012. (Tr. 238.) The assigned Administrative Law Judge ("ALJ") held hearings on October 30, 2014 and June 29, 2015, at which Plaintiff was represented by an attorney. (Tr. 43-79.) The ALJ found Plaintiff not disabled from July 3, 2012 through July 20, 2015, the date of the decision.[2] (Tr. 21-35.)

In reaching the decision, the ALJ found that Plaintiff had "the following severe impairments: a history of explosive personality disorder with bad temper, depression and anxiety." (Tr. 23.) The ALJ then found that Plaintiff had

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. (Docs. 10, 12.)

[2] Plaintiff had to establish disability on or before December 31, 2017, his date last insured, in order to be entitled to a period of disability and DIB. (Tr. 21.)

moderate difficulties in activities of daily living, in social functioning, and in concentration, persistence, or pace, and no episodes of decompensation throughout the relevant period.  (Tr. 24-25.)  Further, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform "a full range of work at all exertional levels but with the following nonexertional limitations: no contact with the public and only occasional contact with co-workers and supervisors, simple and repetitive tasks involving one and two step processes to completion."  (Tr. 25.)  After finding that Plaintiff was unable to perform any past relevant work, the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform.  (Tr. 34.)

Plaintiff is appealing the Commissioner's decision that he was not disabled from July 3, 2012 through July 20, 2015.  Plaintiff has exhausted his available administrative remedies and the case is properly before the Court.  The Court has reviewed the record, the briefs, and the applicable law.  For the reasons stated herein, the Commissioner's decision is **REVERSED and REMANDED**.

**I.     Standard**

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

**II.     Discussion**

Plaintiff raises three issues on appeal. First, Plaintiff argues that the ALJ failed to articulate good cause for not crediting the treating opinions of Dr. Yasir Ahmad, Plaintiff's treating psychiatrist. Second, Plaintiff argues that the ALJ made internally inconsistent findings throughout the decision regarding Plaintiff's social functioning limitations. Finally, Plaintiff argues that the new and material evidence submitted to the Appeals Council from Dr. Ahmad and Dr. Dano Leli, who performed a neuropsychological assessment on July 30, 2015, demonstrate that the Commissioner's decision is not supported by substantial evidence.

The ALJ found that Plaintiff was capable of performing "a full range of work at all exertional levels but with the following nonexertional limitations: no contact with the public and only occasional contact with co-workers and supervisors, simple and repetitive tasks involving one and two step processes to completion." (Tr. 25.) In making this finding, the ALJ discussed, *inter alia*, Plaintiff's and his wife's testimony, the records of Plaintiff's hospitalizations, the treatment notes and opinions of Dr. Ahmad, and the opinions of the State agency non-examining consultants. (Tr. 25-34.) With respect to Dr. Ahmad's opinions, the ALJ stated:

> I have given little weight to the broad statements by Dr. Ahmad at Exhibits 3F and 11F, finding that the claimant's mental impairments met listings 12.04 and 12.06, because they are completely contrary to the objective medical evidence and Dr. Ahmad's treatment notes as a whole. Although I find that the claimant is not capable of unrestricted work at all exertional levels, the record as a whole does not substantiate the restrictive assessment by Dr. Ahmad finding that the claimant was markedly limited in his abilities to do activities of daily living, social functioning, and concentration, persistence and pace at Exhibits 3F and 11F. I note that in a separate report completed by Dr. Ahmad in August 2013, Dr. Ahmad noted no limitations with understanding or remembering. The doctor also noted no problems with activities of daily living (Exhibit 6F).
> . . .
> I find that Dr. Ahmad's assessment of disability and the claimant's inability to work are unsupported and involve an issue reserved for the Commissioner.

(Tr. 33.)

Turning to the first issue, the Court agrees with Plaintiff that the ALJ erred in his evaluation of Dr. Ahmad's opinions. Although an ALJ may discount a treating physician's opinions if there is good cause to do so, in the present case,

4

there was no good cause to discount Dr. Ahmad's opinions because the ALJ's reasons for giving those opinions little weight are overly general and not supported by substantial evidence.

In a Mental Health Assessment: Form 12.04 (Affective Disorders), dated March 20, 2013, Dr. Ahmad opined that Plaintiff had a depressive syndrome, characterized by anhedonia, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking; marked limitations in activities of daily living, in social functioning, and in maintaining concentration, persistence or pace; and three or four episodes of decompensation, each of extended duration, resulting in complete inability to function outside of one's home.  (Tr. 450-51.)  On the same day, Dr. Ahmad also completed a Mental Health Assessment: Form 12.06 (Anxiety Related Disorders), stating that Plaintiff suffered from generalized persistent anxiety accompanied by motor tension, a persistent irrational fear of a specific object, activity, or situation, and recurrent severe panic attacks.  (Tr. 452.)  He opined that Plaintiff had marked limitations in activities of daily living, in social functioning, and in maintaining concentration, persistence, or pace; had three or four episodes of decompensation, each of extended duration; had a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; and a current history of one or

more years' inability to function outside a highly supportive living arrangement. (Tr. 453.)

On August 5, 2013, Dr. Ahmad completed a Psychiatric Report for the Social Security Administration, in which he stated, *inter alia*, that Plaintiff's sustained concentration and persistence, social interaction, and adaptation were limited; that Plaintiff could do most of the daily activities listed on the form; that Plaintiff was "less angry, with better impulse control on earlier visits," but "angry" during his last visit, with fair concentration and judgment; and that there "has been little progress thus far."  (Tr. 532-36.)

On February 17, 2014, Dr. Ahmad wrote a letter regarding the potential ramifications in the event Plaintiff lost his health insurance.  (Tr. 557.)  The letter stated:

> Patrick has diagnosis [sic] of Intermittent Explosive Disorder and Major Depression.  He has been under my care for several years now, but his condition has been deteriorating as of recent.  Patrick has been having more of the outburst [sic], he has periods where he can get physical.  Several times in my office he began viciously beating himself in the head.  There have been other times where it has been reported he "lost it" on strangers and even family.  He would engage in verbal altercations with individuals over relatively obscure issues.
>
> He was therefore placed on medications to help reduce the temperament, but those [m]edications require constant monitoring for them to be effective.  Without any medication treatment[,] it [is] likely that his condition will worsen[,] some of the consequences could include physical aggression where he could even harm others.
>
> I am hopeful that due to these particular reasons there is some way

>that his insurance will be continued, so I can safeguard against such an event and provide necessary care.

(*Id.*)

On February 24, 2014, Dr. Ahmad again completed a Mental Health Assessment: Form 12.04 (Affective Disorders), in which he opined that Plaintiff had a depressive syndrome, characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking; marked limitations in activities of daily living, in social functioning, and in maintaining concentration, persistence, or pace; and three or four episodes of decompensation, each of extended duration. (Tr. 573-74.)

The ALJ gave little weight to Dr. Ahmad's opinions included in the Mental Health Assessments completed on March 20, 2013 and February 24, 2014, because they were "completely contrary to the objective medical evidence and Dr. Ahmad's treatment notes as a whole." (Tr. 33.) In addition to being overly general, the ALJ's reasons to reject Dr. Ahmad's opinions are not supported by substantial evidence. Throughout the decision, the ALJ stated that despite Plaintiff's subjective complaints, Plaintiff's mental status examinations were generally normal and his medications were helping, when taken as prescribed.[3]

---

[3] The ALJ's decision implies that there was non-compliance with treatment. However, as discussed *infra*, Plaintiff's medications were constantly adjusted without much success. The record indicates that Plaintiff was willing to try, and did try, different
(continued...)

7

(*See* Tr. 28-31, 32 ("The evidence establishes that when managed properly with a combination of medications to control his anger, rage, anxiety and mild depression, the claimant has the capacity to function adequately to perform many basic activities associated with work. Moreover, there are no clinical findings which would come close to support the degree of inability alleged. . . . Progress notes indicated that it was apparent that when he was compliant with medication, his mood stabilized and his anger and impulse control improved (Exhibits 1F, 2F, 4F, 5F, 7F, 10F, 12F, 14F, 15F and 16F)."), 33 ("I find that when he stays on his medications, he is stable[.]").)

However, contrary to the ALJ's statements, Plaintiff's mental status examinations indicate that regardless of any sporadic temporary improvement, Plaintiff's condition has generally deteriorated and he has made little progress, despite regular outpatient psychiatric treatment, two hospital admissions, participation in group and individual therapy, and Plaintiff's compliance with

---

[3](...continued)
medications at various doses, but he still exhibited some serious symptoms and required hospitalizations to stabilize his mental condition. (*See, e.g.*, Tr. 578 ("Severity of symptoms, failure at lower level of care and presumed danger to self" listed under justification for hospital admission and care), 583 ("Patient continues to experience severe depression with functional impairment despite aggressive outpatient management. As such, he would benefit from inpatient stabilization. He has requested transfer to in-network facility and is medically stable for transfer. Patient will thus be transferred to Ramapo Ridge Hospital for additional acute inpatient stabilization.").) Even when Plaintiff was heavily medicated, the symptoms did not seem to resolve. (*See, e.g.*, Tr. 578 (noting "medication resistant illness is absolutely clearly documented"), 592 (noting good impulse control, but Plaintiff was "overly sedated," his affect was flat, and his mood was "too tired").)

prescribed treatment.  (*See* Tr. 390-91 ("Pat attended 14 days of Partial Care and 18 days of IOP between June 22, 2012 and August 15, 2012. [Patient] attended group sessions daily and individual sessions weekly. [Patient] had a family session with his wife. . . . The [patient] was recommended to continue treatment with a psychiatrist and therapist."),[4] 423 (noting Plaintiff went to the emergency room three times, with the most recent visit leading to an inpatient admission), 576 (admitted to Ramapo Ridge Psychiatric Hospital Inpatient on July 9, 2014, after spending two days at Hackensack University Medical Center, for very high levels of depression, extreme levels of somnolence, feelings of hopelessness, worthlessness, suicide thoughts ("I have feeling that there is no reason for me to stay alive anymore.  I am as good as dead to my family and myself and I should go."), and discharged on July 14, 2014)[5].)

---

[4] Treatment records from High Focus Centers describe anxious, labile, and/or constricted affect; sad, anxious, and/or angry mood; agitation and hyper-irritability; poor concentration and focus; restlessness and disorganization; depressed mood and anhedonia; longstanding pattern of worrying; sense of powerlessness; rapid, pressured, and loud speech; poor insight; severely impaired judgment and impulse control; depressive personality; difficulty falling asleep and staying asleep, and sleeping sixteen hours a day; fatigue; indecisiveness; and an inability to drive.  (Tr. 400-02, 405, 407, 409, 411, 413, 415, 419, 421 (noting "extreme mood irritability, rage, anger, frustration"), 423-24, 427.)  Treatment records from the Center of Revitalizing Psychiatry similarly show anxious, labile, constricted, and/or angry mood/affect, hopelessness, helplessness, increased sleep, fatigue, irritability, road range, impulsivity, decreased concentration, disorganization, severe or moderate impairment of activities of daily living, and homicidal ideation.  (*See, e.g.*, Tr. 429-34.)

[5] At the time of transfer, Plaintiff's mental status examination showed: "Poor grooming. Psychomotor retardation.  Eye contact poor.  Speech underproductive.  Mood depressed.  Affect dysphoric. . . . Thought content significant for passive suicidal

(continued...)

9

For example, on April 16, 2013, Plaintiff's mental status examination indicated anxious mood, slightly anxious affect, fair to poor impulse control, and fair insight. (Tr. 530.) Plaintiff complained of more anxiety, poor energy in the morning, and indicated that the prior adjustment of his medications "has only helped minimally" and he was "still having a lot of anxiety issues." (*Id.*) Although in June 2013, Plaintiff's anxiety and depression were controlled better[6] (Tr. 529),

---

[5](...continued)
ideations without plan. . . . Judgment, insight and impulse control limited[.]" (Tr. 582.) At Ramapo Ridge, it was noted:
> [I]t is very important to realize that the patient has been diagnosed with major depressive disorder and intermittent explosive disorder in the past. This is his second admission, first one happened two years ago when he first developed his symptoms. The patient has been exhibiting signs of explosive behavior and even though he was never resolving to violence against people, violence against objects and environment has been observed. He was punching holes in the walls, destroying less and more valuable objects in the household and being the fact that he is really large framed, very muscular looking gentleman I can imagine how scary it is to people who surround him at that moment.

(Tr. 576-77.) Plaintiff's mental status exam indicated depressed mood, constricted affect, and "recurrent thoughts about death, dying but no plan to commit [] suicide." (Tr. 577-78.) His diagnoses on admission included, *inter alia*, major depressive disorder, severe, recurrent without psychosis; intermittent explosive behavior; rule out anxiety, not otherwise specified; medication resistant to illness with severe symptoms interfering with employment; and a GAF score of "[a]pproximately 25, highest in the last year most probably around 32 to 35." (Tr. 578.) On discharge, he was diagnosed with, *inter alia*, major depressive disorder, severe and recurrent without psychotic features; intermittent explosive disorder; anxiety disorder, not otherwise specified; illness resistant to medication, severe symptoms interfering with his ability to function and get employed; and a GAF score of 25 on admission and about 37 on discharge. (Tr. 585-86.) Plaintiff's prognosis was guarded. (Tr. 586.) After discharge, Plaintiff saw Dr. Ahmad and complained of rage and some paranoia. (Tr. 589.)

[6] Plaintiff also experienced improvement in December 2013 and February 2014, but in March and April of 2014 he was having outbursts again, was feeling more
(continued...)

in late July 2013 his mood was angry and his impulse control was again poor, leading to further adjustments of his medications (Tr. 527). In September 2013, rather than being unremarkable as noted by the ALJ (Tr. 30), Plaintiff's mental status exam indicated an angry mood, labile affect, and very poor impulse control (Tr. 538). During the same visit, Plaintiff was "very demonstrative" and "started punching himself in his head."[7] (*Id.*) Dr. Ahmad did not hospitalize Plaintiff that day only because he talked to Plaintiff's family, who were very concerned and afraid to be near him, and they made sure that Plaintiff would see a therapist immediately. (*Id.*) Plaintiff reported he did not see how he could be productive in society any longer. (*Id.*)

Plaintiff also reported to various medical providers that he did not feel his medications were helpful. (Tr. 402, 424 (noting that "none of the [medications] have worked"), 425 (listing past medications that did not work), 428 (noting "treatment so far has not helped"), 429 (not responding to medical treatment),

---

[6](...continued)
depressed, hopeless, and anxious, and was asking for medication adjustments. (Tr. 558, 593.) Plaintiff was also doing better in June 2014 (*see* Tr. 591), but apparently not for long as he was admitted to the hospital in July 2014, as mentioned earlier.

[7] Plaintiff's multiple episodes of anger and impulse control issues are well documented in the record. (*See, e.g.*, Tr. 396 (noting yelling, screaming, punching holes in walls, breaking and throwing things), 405 (noting that Plaintiff started punching the dashboard while his wife was driving him), 417 (noting an episode at the DMV where Plaintiff was verbally abusive), 423 (punching walls and road rage), 428, 433, 524 ("Patient struck his left foot against a wall in a fit of anger last night. He awoke with pain and swelling of the foot. Having difficulty ambulati[]ng."), 538 (noting an incident where Plaintiff nearly hurt a patron at the store over $5), 576.)

539 ("[Patient does not] feel there is any help, we talked about a variety of options including medication changes. He is also willing to consider starting therapy."), 559, 577-78 ("[H]e does not believe that it is a winning combination of drugs for him.").) The record indicates that Plaintiff's medications were adjusted numerous times, apparently without much success. (*See* Tr. 406, 408, 418, 420, 422, 527-30, 539-40, 559, 587-89.) Nevertheless, Plaintiff complied with his prescribed treatment. (*See, e.g.*, Tr. 577 ("Since [2012] he has been under the care of psychiatrist and has been compliant.").)

On this record, the ALJ's statement, without any explanation, that Dr. Ahmad's opinions in the Mental Health Assessments are completely contrary to the objective medical evidence and Dr. Ahmad's treatment notes, is insufficient to rise to the level of good cause and does not appear to be supported by substantial evidence. Although the ALJ did not need to give controlling weight to Dr. Ahmad's opinion to the extent it was on an issue reserved to the Commissioner, the ALJ was still required to "evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." SSR 96-5P.

In rejecting Dr. Ahmad's opinions in the Mental Health Assessments, the ALJ noted that in his August 5, 2013 Psychiatric Report, Dr. Ahmad noted no limitations with understanding or remembering and noted no problems with

12

activities of daily living. (Tr. 33.) However, lack of limitations in one functional area does not imply that there no limitations in other areas. Dr. Ahmad specifically stated in his August 5, 2013 report that Plaintiff's sustained concentration and persistence, social interaction, and adaptation were limited. Further, although Dr. Ahmad opined in the report that Plaintiff could do most of the daily activities listed on the form, he never indicated that Plaintiff had no problems with activities of daily living. Rather, in three separate forms, Dr. Ahmad noted that Plaintiff had marked limitations in activities of daily living. It appears that the ALJ misinterpreted Dr. Ahmad's August 5, 2013 report. Although the ALJ interpreted the report as saying that Plaintiff "was less anxious and less angry with better impulse control" (Tr. 30), it was actually reported that Plaintiff was "less angry, with better impulse control *on earlier visits*" (Tr. 534 (emphasis added)), and there "has been little progress thus far" (Tr. 536). This report appears consistent with Dr. Ahmad's February 17, 2014 letter, which the ALJ did not specifically address, but which provides that Plaintiff's "condition has been deteriorating as of recent," and he has been having more outbursts where he could get physical. (Tr. 557.)

Based on the foregoing, this case will be remanded with instructions to the ALJ to properly consider Dr. Ahmad's opinions, explain what weight they are being accorded, and the reasons therefor. In light of this conclusion and the

possible change in the RFC assessment, the Court finds it unnecessary to address Plaintiff's remaining arguments. *See Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam); *Freese v. Astrue*, 2008 WL 1777722, at *3 (M.D. Fla. Apr. 18, 2008); *see also Demenech v. Sec'y of the Dep't of Health & Human Servs.*, 913 F.2d 882, 884 (11th Cir. 1990) (per curiam). However, on remand, the Commissioner is directed to reconsider all evidence, including the new evidence made part of the record, in rendering a decision. *See, e.g., Alexander v. Comm'r of Soc. Sec.*, Case No.: 8:13-cv-1602-T-GJK, 2014 WL 4211311 at *3 n.3 (M.D. Fla. Aug. 26, 2014) (citing *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (stating that on remand the ALJ must reassess the entire record)).

Accordingly, it is **ORDERED**:

1. The Commissioner's decision is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), with instructions to the ALJ to: (a) reconsider Dr. Ahmad's opinions, explain what weight they are being accorded, and the reasons therefor; (b) consider all evidence, including the new evidence made part of the record, in rendering a decision; (c) reevaluate Plaintiff's RFC assessment, if necessary; and (d) conduct any further proceedings deemed appropriate.

2. The Clerk of Court is directed to enter judgment accordingly,

terminate any pending motions, and close the file.

      3.     In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012). This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

      **DONE AND ORDERED** at Jacksonville, Florida, on March 27, 2017.

                                                            MONTE C. RICHARDSON
                                                    UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record